Newell MORROW and Angie Morrow, his wife, Appellants,

v.

Russell W. DODSON and Thomas D. Garland, Appellees.

Court of Appeals of Kentucky.

March 29, 1968.

———◆———

John G. Prather, Lawrence S. Hail, Somerset, for appellants.

Adams & Adams, Charles C. Adams, Somerset, for appellees.

CULLEN, Commissioner.

The controversy in this litigation is over the ownership of a parcel of land on the southeast edge of a peninsula extending eastward into Lake Cumberland, known as Martin Bend. Other lands of the plaintiffs, Dodson and Garland, lie to the north and northwest of the disputed parcel, on the peninsula, and other lands of the defendants, Morrow and wife, lie to the south and southeast, across the lake. The circuit court adjudged that the disputed parcel belonged to Dodson and Garland. The Morrows have appealed.

Prior to the impounding of Lake Cumberland the South Fork of Cumberland River flowed around the peninsula. There was river-bottom land along the edge of the river, and above and behind that there was a cliff line extending around the peninsula. Preparatory to the impounding of the lake the Federal Government bought the river-bottom land and also bought the cliff property to a line a short distance inland from, and roughly parallel with, the cliff line. The latter line is known as the "Government Line." The lake now covers all of the bottom land and water reaches near to the top of the cliff.

Morrow owned a substantial amount of land to the south and southeast of the river, and claimed that his ownership extended across the river to include land on the southeast edge of the peninsula, inland from what is now the "Government Line." Dodson and Garland owned land extending southward across the tip of the peninsula from the north edge. They claimed that their line ran at least to the "Government Line" on the south side of the peninsula. The parcel in dispute is a small acreage extending north from the "Government Line."

The circuit court adjudged that Morrow had never owned any land north of the river, i.e., had never owned any land on the peninsula. This finding must have come as

quite a shock to the Federal Government, which had paid Morrow for the land it acquired on the southeast edge of the peninsula, having been convinced that he owned it. Also, the finding causes one to wonder why the peninsula is called Martin Bend, since the only Martin appearing in the history of ownership of land in that area was Mose Martin, who was a predecessor in title to Morrow but who, under the finding, never owned any land on the peninsula. However, these idle reflections need no consideration because the plain, cold fact is that Dodson's and Garland's *own* evidence and their own deeds show conclusively that Morrow *did* own land on the southeast side of the peninsula.

The deed under which Dodson and Garland claim title describes two tracts of land. The description of one of the tracts commences at a corner identified as being a mutual corner of *Morrow's* with other owners, on the "Government Line," near the county road. The description then runs southwestwardly *"with the Newell Morrow line"* to a stake. This line plainly has to be *north* of the "Government Line." Accordingly, the deed itself shows that Morrow owned north of the "Government Line" and therefore owned at least some of the disputed parcel. The description of the other tract in the deed to Dodson and Garland (which is west of the first tract) runs north from a point on the "Government Line" a distance of 240 feet, thence east to a stake "in the Newell Morrow line," thence south "with Morrow's line" to the beginning. This shows that Morrow owned to a point at least 240 feet above the "Government Line," and probably more, because the eastward call did not end at a *corner* in Morrow's north-south line.

The surveyor who testified for Dodson and Garland frankly admitted that he had made no effort to survey or locate the Morrow line, despite the fact that it was described in the deed to Dodson and Garland as being the southern boundary of their land in the immediate area of the disputed parcel. In fact, the surveyor testified that he did not know where the Morrow line

was. He said, "We were under the impression that the Government line was the Government line and the Morrow line."

Since the southern boundary of the property of Dodson and Garland is described in their deed as being the Morrow line, it seems clear that the proper location of that line should be the determinative factor. See Ross v. Richardson, 173 Ky. 255, 190 S. W. 1087. However, Dodson and Garland in the presentation of their proof made no effort to locate that line. They sought only to prove that the patent to which they traced their title ran to the bank of the river and therefore any title claimed by Morrow north of the river was junior and subordinate to their title. In other words, they claim that Morrow's line as mentioned in their deeds means the line to which Morrow *legally* has title.

We are not fully convinced that the call for the Morrow line could not and would not mean the line understood and recognized to be the *actual* line to which Morrow claimed, regardless of whether Morrow or some *stranger* had legal ownership. If Dodson's and Garland's deed took them only to the Morrow line, it would seem of no concern to them whether Morrow legally owned to that line or whether someone else had a better title than Morrow's.

In any event, we think the evidence is not convincing that the patent relied upon by Dodson and Garland did in fact run along the bank of the river in the area in dispute. Dodson and Garland pitch their argument on this language in the patent:

"* * * thence down said river binding thereon N 79 E 90 poles, N 46½ E 104 poles, N 24 E 90 poles, to a sugar tree and ash; * * *"

Admittedly, the first of these three courses and distances runs along the river bank. The evidence shows that if the second and third are plotted, they leave the river, run to the top of the cliff, and then across the high land inland from the cliff to a point on the northeast edge of the tip of the peninsula,

near a sugar tree and ash. If so plotted, the line would run north of the disputed parcel. Dodson and Garland maintain that the entire line described above follows along the bank of the river, around the end of the peninsula, to the sugar tree and ash. They argue that the words, "thence down the river binding thereon," modify all three of the courses and distances that follow those words.

We think there are at least two reasons why the construction so advanced cannot be accepted—First, and most important, is the fact that in a number of subsequent conveyances the second course, N 46½ E, was treated and recognized as leaving the river and running to the cliff. In fact, the contemporaneous construction throughout the various conveyances was that the second and third courses did *not* run along the river. A second fact of some significance is that if the patent did follow the river around the end of the peninsula it embraced a much greater quantity of land than the 50 acres it purported to embrace.

The evidence in this case for the Morrows showed that their line ran across the tip of the peninsula at such a location as to embrace the parcel in dispute. They traced their title back to the Commonwealth. On the other hand, Dodson and Garland made no effort to show the location of the "Morrow line" which by their own deeds constituted the boundary of their property in the area of the disputed parcel. Accordingly, it must be considered that Dodson and Garland failed in the burden to establish their title, but the Morrows (who had counterclaimed asking that their title be quieted) did sustain the burden to establish their title. Accordingly, the judgment is erroneous in granting relief to the plaintiffs rather than to the defendants.

The judgment is reversed with directions to enter judgment quieting the title of the defendants to the parcel in dispute.

All concur.